IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| DR. DARA PARVIN | ) |
|       Plaintiff, | ) Case No. 6:10-cv-6332-HO |
| v. | ) ORDER |
| CNA FINANCIAL CORPORATION d.b.a., "CNA INSURANCE COMPANY" and CONTINENTAL CASUALTY COMPANY, | ) |
|       Defendants. | ) |

INTRODUCTION

Dr. Dara Parvin (plaintiff), filed a civil action in the Circuit Court of the State of Oregon for Coos County, alleging breach of an insurance contract against defendants CNA Financial Corporation (CNA) and Continental Casualty Company (CCC), and seeking economic damages of $25 million and punitive damages of $125 million. [#4-Ex.A]. Defendants removed the matter and moved to dismiss. [#14]. On May 24, 2011, the court, denied the motion to dismiss. [#25].

Defendants now move for summary judgment against plaintiff's

ORDER - page 1

claims, asserting that CCC complied with the terms of the policy (PSC 1087741372), when it settled the Mason lawsuit. Further defendants argue that CNA should be dismissed because it is not a proper party to this contractual dispute between CCC and plaintiff.

Plaintiff responds that defendants breached their contract with plaintiff by settling a defensible lawsuit against him despite lacking authority to settle, because neither plaintiff nor the Oregon Medical Association Professional Consultation Committee (OMAPCC), consented to settle the suit. Plaintiff also moves for partial summary judgment on breach of contract liability. [#60]

The case stems from a medical malpractice action that Gloria Mason, filed against plaintiff. [#48]. CCC was Dr. Parvin's medical malpractice insurer with the authority to settle a case against him with the consent of either Dr. Parvin or the OMAPCC. The matter proceeded to trial and settled for $1.5 million after the fourth day.

Discussion

1.  Factual Background:

The following facts gleaned from the parties' briefing, are viewed in the light most favorable to plaintiff, the non-moving party.

Plaintiff is an orthopedic spine surgeon whose medical

ORDER - page 2

malpractice policy No. 1087741372 (the policy) was issued by CCC and produced by CNA (Producer's Code No.970-005054). [#51-Ex.2,p.3; #50-Ex.1, p.28]. The policy was current at all times relevant to this matter and had a $5 million limit of liability for each claim, a $5 million aggregate limit and a $5 million combined single limit. [#50-Ex.1]. Under the amended terms of the policy, CCC has:

> "the right and will defend any claim. We will do this even if any of the charges of the claim are groundless, false or fraudulent. We will investigate any claim we feel is appropriate. We will not settle any claim without your consent or the consent of the Association's Committee formed for this purpose . . . ."

[#50-Ex.1,p.96].

The Association is defined as:

> "the Society, the Oregon Medical Association or any other designation used to describe the sponsoring organization."

[#50-Ex.1,p.97]. The OMA PCC is empowered by the OMA to settle lawsuits under the terms of individual policies and is the liaison between the OMA and CNA. [#51-Ex.1,pp.2-3].

On August 10, and August 13, 2005, plaintiff performed surgeries on Ms. Mason's spine. [#51-Ex.3,p.3]. Ms. Mason subsequently suffered permanent loss of the use of her legs as well as control of her bladder and bowels. *Id.* Ms Mason filed suit on August 7, 2007, contending that her paralysis was caused by plaintiff injuring her spinal cord during surgery and seeking damages in excess of $4 million. *Id.* Plaintiff denied liability

and contended that the paralysis resulted from Ms. Mason suffering a stroke/ischemic event, cutting off the blood supply to her anterior spinal column. [#51-Ex.2, pp.4-6].

CCC agreed to provide a defense under the terms of the policy. [#49-p.2]. Defense counsel originally assessed the case as 50/50 in terms of defensibility. [#49-p.2 and Ex.1]. However, later in an April 25, 2008, at a CCC Claims Legal Exposure Management (CLEM) meeting, counsel gauged the chance for a defense verdict as 60-75% and stated that Ms. Mason's potential recovery could be close to $2 million. [#51-Ex.2, p.18]. On June 3, 2008, Ms. Mason's counsel made a $2.2 million settlement offer. [#49-p.2 and Ex.2]. This offer was discussed with plaintiff who did not agree to settle the case. [#51-Ex.2, pp.8-10].

Another CLEM meeting was held on June 25, 2008 at which defense counsel gauged a 65% chance of a defense verdict. [#49-p.3 and Ex.4]. Plaintiff signed a non-consent to settle on June 30, 2008. [#49-p.3 and Ex.5].

At a July 9, 2008, CLEM meeting, defense counsel reduced the defensibility to 60% because a neuroradiologist could not exclude Ms. Mason's theory that Dr. Parvin had injured her spinal cord. [#49-p.3, Ex.6]. By July 13, 2008, defense counsel advised settlement as the best resolution because three neuroradiologists had agreed that the CT scan showed a "surgical mishap." [#51-

ORDER - page 4

Ex.4,pp.22-24].

Upon receiving the CT scan results, a CLEM meeting was held on July 14, 2008, at which defense counsel dropped the chance of a defense verdict to 30-40%. [#49-p.3, Ex.7; #51-Ex.4,p.24]. He communicated the likely unfavorable verdict to plaintiff when Dr Campbell, plaintiff's mentor, did not support plaintiff's causal theory. [#51-Ex.4,pp.25-26]. Plaintiff remained adamant that he wanted the case brought to trial. [#51-Ex.4,p.27].

CCC instructed its OMA PCC liaison to coordinate a meeting to seek the OMA PCC's consent to settle the case. [#50-p.2]. The meeting was held on July 16, 2008. *Id.* Plaintiff, defense counsel, insurance representatives and the OMA PCC representatives were present and agreed not to settle pre-trial however, the OMA PCC wanted to have "somebody from CNA . . .present at trial with authority to settle if the trial did not go well." [#51-Ex.1,p.5].

The trial began on July 21, 2008. [#49-p.3]. Ms. Mason's case rested on the third day of trial and all agreed it had been presented very well. [#49-p.4]. Plaintiff's case began the afternoon of the third day and called its first expert witness, who, to the defense counsel's surprise, testified that he agreed with Ms. Mason's theory of the case - that plaintiff had injured her spinal cord. [#51-Ex.4,pp.16-17]. The remainder of the defense case went reasonably well. *Id.*

At the close of the fourth day of trial, Ms. Melanie Spiering, a CNA representative attempted to call an OMA PCC meeting regarding settlement of the case. [#50-p.2]. A meeting did not happen, however CNA claims consultant Norene Quaam negotiated a settlement of $1.5 million late that same evening. [#49-p.4].

Mr. Frisch, OMA counsel testified that he agreed that CCC had the authority to settle the Mason lawsuit as a result of his communication with Dr Rosenblatt, an OMA PCC committee member. [#51- Ex.6,pp.4-5]. Dr. Rosenblatt testified that although a meeting of the OMA PCC was not held, he believed it was unnecessary to do so because the OMA PCC committee at their previous meeting had already "voted unanimously to allow cna [sic] to settle the case at any time it seemed most appropriate." [#51- Ex.6, pp.5-6, 8].

Plaintiff disputes this recollection and therein lies the material fact issue. Viewing the record before the court in the light most favorable to plaintiff, there is a question of whether, CCC had the actual authority through consent by the OMA PCC, to settle the Mason case for $1.5 million. Without the consent of either plaintiff or the OMA PCC, CCC unilaterally settling the case would clearly breach of their contract with plaintiff.

Finally defendant CNA's assertion that it should be

ORDER - page 6

dismissed because it has never done business with plaintiff seems disingenuous given that they freely admit that CNA is the parent of Continental Corporation, which is the parent of CCC - the company that issued the policy to plaintiff. [#50-Ex.1]. A policy which incidentally, is emblazoned with the CNA logo. [#50-Ex.1-p.1].

Defendant CNA contends that logo is merely a "service mark" which CCC is permitted to use in its insurance underwriting and claims. [#15-p.4]. However its web page says:

> "CNA Financial Corporation is one of the largest commercial property and casualty insurance organizations in the United States providing insurance protection to more than one million businesses and professionals in the U.S. and internationally." And explains:

> "CNA, a financial holding company, conducts its property and casualty insurance operations primarily through Continental Casualty Company (CCC) . . . ."

[#17-Ex.1]. The page further explains that CNA's core business is commercial property and casualty insurance operations which it provides "both domestically and abroad through a network of brokers, managing general underwriters and independent agencies." *Id.*

Subsequent exhibits submitted by plaintiff demonstrate that the officers of CCC and CNA are identical. [#17-Exs.2-3]. For example, Thomas Motamed is the CEO and president of both CCC and CNA and Jonathan David Cantor is the executive vice president, general counsel and secretary of both entities. [#17-Ex.2]. In

ORDER - page 7

fact, the entire slate of officers is identical in both companies with the sole exception of Dennis Hemme, who is senior vice-president and treasurer of just CCC. [#17- Exs. 2-3].

A parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes. *Harris Rutsky & Co. Ins. Serv. Inc. V. Bell & Clements Ltd,* 328 F.3d 1122, 1134 (9th Cir. 2003). However, a subsidiary's contacts may be imputed to its parent for personal jurisdiction purposes where the subsidiary is the parent's alter ego. *Id.*

To demonstrate a parent and its subsidiary are alter egos, the plaintiff must establish a *prima facie* case that the two companies share "such unity of interest and ownership" that the companies' separateness no longer exists and "failure to disregard [their separate identities] would result in fraud or injustice. *Doe v. Unocal Corp.,* 248 F3d 915, 926 (9th Cir. 2001). To demonstrate a unity of interest warranting disregard of corporate separateness, the plaintiff must show the parent controls its subsidiary to such a degree as to render the subsidiary a "mere instrumentality" of its parent. *Id.* Typically, this would involve showing the parent controls the subsidiary's internal affairs or daily operations. *Kramer Motors Inc. V. British Leyland, Ltd.,* 628 F.2d 1175, 1177 (9th Cir. 1980).

ORDER - page 8

To overcome the established common-law principle of corporate law that directors and officers holding positions with a parent and a subsidiary can and do change hats to represent the two corporations separately despite their common ownership, plaintiff will need to show that the officers and directors were acting as CNA officers rather than CCC officers when the alleged contract breach occurred. *U.S. v. Bestfoods*, 524 U.S. 51, 69 (1998)(lone fact of having identical directors may not serve to expose corporate parent to liability for its subsidiary's acts).

Plaintiff has established sufficient facts to raise a possibility that CCC is simply an alter ego of CNA and avoid summary dismissal of CNA.

## Conclusion

For the reasons detailed above, defendant's Motions for Summary Judgment [#47] is DENIED. Plaintiff's Motion for Partial Summary Judgment [#60] is DENIED.

IT IS SO ORDERED

DATED this __31st__ day of October, 2012.

_____
UNITED STATES DISTRICT JUDGE